## Ætna Life Insurance Co. v. Mary A. Shoemaker.

1. VERDICTS—*Not Satisfactory upon the Evidence.*—Where, upon an examination of the evidence, the verdict is not satisfactory upon the facts, the judgment upon it will be reversed.

2. EXPERT TESTIMONY—*When Not Warranted.*—In an action on an insurance policy, upon the issue of accidental death or suicide by shooting, there is nothing to warrant expert evidence as to the effect of morphine on a person whose brain is affected, or kindred questions.

Assumpsit, on a policy of life insurance. Appeal from the Circuit Court of Massac County; the Hon. JOSEPH P. ROBARTS, Judge, presiding. Heard in this court at the February term, 1895. Reversed and remanded. Opinion filed July 1, 1895.

COURTNEY & HELM, attorneys for appellant.

R. W. McCARTNEY and C. L. V. MULKEY, attorneys for appellee.

MR. JUSTICE SAMPLE DELIVERED THE OPINION OF THE COURT.

On September 17, 1892, Richard Shoemaker, the husband of appellee, took out a life insurance policy in favor of his wife. On the 21st day of July, 1893, he was killed by a shot from a revolver held in his own hand. To the declaration, declaring on the policy, the defense of suicide was interposed by plea, the policy by its terms being void in case of suicide. Issue was joined on this plea, on which, alone, the case was tried before a jury. Verdict and judgment were given for plaintiff, from which this appeal is prosecuted. The contention on part of plaintiff was, the shooting was accidental; on the part of the defendant, that it was intentional. The case is peculiar and tragic. The deceased had had some litigation and trouble with some members of the Lukens family, residing in Metropolis, which, on his part, became very bitter. The litigation was closed before the tragedy, but his animosity seemed to deepen. A few weeks before the 21st of July, Richard Luken was talking with a Mr. Wilson, at the latter's house, near the gate, when the deceased, as he was passing along the street in a buggy, observed the former, stopped and began to threaten and abuse him, to which Lukens made no reply. A Mr. Davisson testified that he was on intimate terms with the deceased, and just a few days before his death had a talk with him. " He told me about his difficulty with the Lukens boys, and said if he had had his pistol he would have killed them; that he had fought them both; the next time he was going to clean them up. I walked with him to my house and he was telling me that he had spent about $20,000 of his wife's money and that he

was going to leave her just as well off. I asked him how. He said he had taken out, or would take out, that amount of life policies." He had $20,000 life insurance at his death. The deceased, a short time before the tragedy, asked Mr. Flannigan, a merchant of Metropolis, " If, in case a man had a policy on his life, could it be collected if a man committed suicide ? " Dr. Cowan testified that on several occasions the deceased asked him which was the most vital part of the body, and " Where, if I was going to kill a man, would I shoot him or stab him, to cause death quick ? " The last talk was about two days before his death. " I told him that the best place to be sure was where he would rupture a main artery, or where he would separate a man's nerves. I told him that he would have four chances in shooting in the region of the stomach; told him the heart was very hard to hit; you would always strike too far in front, or too far back; that there was only one chance to cause death by shooting through the brain * * * and explained what portion of the brain would kill;" says he further told him if, by shooting in the bowels, the aorta was struck, it would be instant death; if it was not struck, there would be death, but it would be lingering and excruciating. Some of these talks had been several years before, but the last one was very shortly before his death. Sunday before the shooting, the deceased obtained a Smith & Wesson revolver of McElyea, and on the evening before, the same kind of a revolver from Fisher, saying he wanted to go to the springs and wanted one that would throw out the shells. On the day of the tragedy he went into the grocery store of his friend Sheppard and left two revolvers with him, saying, " Take care of them for me; I might be arrested." He went out and came back in a short time and says, " I don't think there is any danger now. I gave them to him." He had before told Mr. Sheppard he would kill the Lukens and then he would be willing to die; but Mr. Sheppard remonstrated with him. For about one week before the shooting, the deceased had visited Mr. Hyderman's place of business nearly every day, which was situated about seventy-five feet from Lukens' and inquired

about them. As stated by Mr. Hyderman, " When the shooting scrape was, he was there pretty nearly all the afternoon. He was asking where the Lukens were working. I told him they were working on Mr. Holmes' house, and then he went around and looked through the windows, but couldn't see them. He called me and said : ' I don't see them there at work.' I says, ' They may be working at the shop.' He had been there a dozen times and peeped through the back door to see if they were working there that day. He was talking about killing the Lukens. He says to me, ' John, I am going to kill all of them.' I told him, ' You put yourself in trouble; you will get in the penitentiary, or they will hang you.' He says, ' No officers can arrest me in this town; I will kill myself before the officers can arrest me.' About supper time I said, 'Dick, I must go to supper; I will close up, or you may set here until I come back; ' and I left him there." About this time, J. R. Lukens and his two boys, Dick and George, returned from the country to their homes. Dick was married, had a family, and lived near his father, which was only about seventy-five feet from Hyderman's store, where Shoemaker was left by Hyderman. They had been home only about half an hour, when, about six and a half o'clock, Shoemaker went into the yard where George was and shot him in the head, then turned on Dick, who had his baby in his arms, and shot him down, and shot him again after he was down. Their father came to the rescue, but he was shot through the hip and escaped. He recovered from the wounds, but his sons died in a few minutes. The shots attracted the attention of the people, and Shoemaker was pursued. He had exhausted all the cartridges of both revolvers, and as he retreated, tried to reload one of them. He threatened those who came near him, and finally succeeded in loading one chamber, when at once the revolver was discharged into his bowels, entering " just on the right and a little below the range of the navel," which caused almost immediate death. At this point the contention begins; the appellee insists the shot was accidental, the appellant that it was intentional. The witnesses agree that Shoemaker, just

before he began to retreat, snapped his revolver at the father, J. R. Lukens—some ten shots having been fired before; that then he retreated and attempted to load his revolver, dropped several cartridges on the ground as he moved along, finally stopped near a fence, when the shot was fired, causing almost instant death. Several witnesses were looking at him at the time, but all necessarily under some excitement. They were closing in on him on different sides. Several testify that he had the revolver that was fired in both hands, with the muzzle pointed toward his body, handling it as if to close it, when it went off. Others testify that they saw him turn the revolver in his right hand toward the body and fire.

In support of the accidental discharge, there is proof that the McElyea revolver was rusty in the hammer or springs, so that when fired the hammer would not slightly rebound and hitch there, off the cartridge, as intended. On one occasion, when handled by McElyea's son, it went off prematurely, on this account, it is said. There were five persons who witnessed the shooting that is in controversy—Ferrell, Robinson, Moreland, Liggett and Keath. The first three say the act was done by Shoemaker while slightly stooping, with the revolver turned upon himself, held in his right hand; the other two say he had the revolver in both hands, in a stooping posture, apparently loading it. All agree the former were the first to reach the body, each of whom testified there was a revolver clasped in each hand, as it lay on the ground; the latter do not contradict that statement. There were no loads in the revolver at that time, as all agree who examined or saw the revolvers examined. Keath says, "He laid one right down. He broke the other pistol and was loading it. He put one in and put in from three to four. After he got it loaded, he then took the pistol this way, when he broke it together. That is when it fired. He looked at me and says, 'O John, come here! I have shot myself.' I says, 'Lower your pistol and I will.' As soon as that pistol fired, he just clasped that pistol that way; it seems this pistol went over here (illus-

trating); he fell over on that arm;" meaning the left arm. He further says, "I saw him pick up the pistol after the shot." Squire Liggett says, "I saw him take his left hand and turn the barrel up. I couldn't tell what he was doing. He seemed to be trembling a good deal. When he turned the barrel up the pistol went off. *He had the butt of the pistol in his right hand, with the finger on the trigger.* I thought he died quicker than any man I ever saw." About twenty grains of morphine were found in his pocket.

Various errors are assigned relating to instructions given and refused, rulings on evidence and the motion for new trial. Without elaborating on these points made, suffice it to say the verdict on the facts is not satisfactory. If the case is tried again, it is suggested the word "willful" be left out of the instructions and they be confined to the sharp issues made of intentional death; that instruction No. 2, refused, of appellant's, was not strictly covered by other instructions and is properly framed; that the expert evidence be closely confined to expert matter. There was nothing in the facts or issues warranting expert evidence as to the "effects of morphine on a person whose brain is affected," or any kindred questions. In so holding, we note the evidence of Hyderman, and the condition of hands and body of deceased. Without regard to this holding, probably this question, "Is it not a fact, doctor, that in cases of cerebro-spinal inflammation, or cerebro inflammation proper, that sulphate of morphine is contra-indicated, and that in such cases it acts as a delirifacient instead of a somnificient?" was somewhat difficult for the jurymen to fully comprehend, especially in view of the fact, as shown by this record, they had difficulty in computing interest at five per cent on the policy. In the consideration of this case, the expert evidence as to the sudden and speedy death of Shoemaker, indicating the course of the bullet, has not been overlooked. Facts have been examined and no hypercritical examination has been made of the rulings of the court for an excuse to reverse and remand this cause.

The judgment is reversed and the cause remanded.